UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------x
LISA SCOGNAMIGLIO,

                Plaintiff,

      - against -

ANDREW SAUL, Commissioner of Social Security,[1]

                Defendant.
---------------------------------------------------------------x

**MEMORANDUM & ORDER**
18-CV-6325 (PKC)

PAMELA K. CHEN, United States District Judge:

      Plaintiff Lisa Scognamiglio brings this action under 42 U.S.C. §§ 405(g) and 1383(c)(3), seeking judicial review of the decision made by the Commissioner of the Social Security Administration ("SSA") to deny her claim for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act. Before the Court are the parties' cross-motions for judgment on the pleadings. (Dkts. 10, 14.) Plaintiff seeks reversal of the Commissioner's decision and an award of benefits or, alternatively, remand for further administrative proceedings. The Commissioner asks the Court to affirm the denial of Plaintiff's claim. For the reasons that follow, the Court grants Plaintiff's motion for judgment on the pleadings and denies the Commissioner's motion. This case is remanded for further proceedings consistent with this Memorandum & Order.

---

[1] Andrew Saul became Commissioner of the Social Security Administration on June 17, 2019. Pursuant to Federal Rule of Civil Procedure 25(d), Andrew Saul is substituted as Defendant in this action. *See* Fed. R. Civ. P. 25(d) ("An action does not abate when a public officer who is a party in an official capacity dies, resigns, or otherwise ceases to hold office while the action is pending. The officer's successor is automatically substituted as a party."); *see also* 42 U.S.C. § 405(g) ("Any action instituted in accordance with this subsection shall survive notwithstanding any change in the person occupying the office of Commissioner of Social Security or any vacancy in such office."). The Clerk of Court is respectfully directed to update the docket accordingly.

## BACKGROUND

**I.     Procedural History**

On October 22, 2014, Plaintiff filed an application for DIB, alleging disability beginning on September 15, 2014. (Administrative Transcript ("Tr."),[2] Dkt. 8, at 132.) On January 14, 2015, Plaintiff's application was initially denied. (*Id.* at 142–53.) Plaintiff then filed a request for a hearing before an administrative law judge ("ALJ"). (*Id.* at 154–55.) On May 17, 2017, Plaintiff appeared with counsel before ALJ David Suna. (*Id.* at 89–131.) In a decision dated January 12, 2018, ALJ Suna determined that Plaintiff was not disabled under the Social Security Act ("the Act") and was not eligible for the benefits for which she had applied. (*Id.* at 8–23.) On October 18, 2018, the ALJ's decision became final when the Appeals Council of the SSA's Office of Disability Adjudication and Review denied Plaintiff's request for review of the decision. (*Id.* at 1–4.) Thereafter, Plaintiff timely[3] commenced this action. (*See* Complaint ("Compl."), Dkt. 1.)

---

[2] Page references prefaced by "Tr." refer to the continuous pagination of the Administrative Transcript (appearing in the lower right corner of each page) and not to the internal pagination of the constituent documents or the pagination generated by the Court's CM/ECF docketing system.

[3] According to Title 42, United States Code, Section 405(g),

> [a]ny individual, after any final decision of the Commissioner of Social Security made after a hearing to which he was a party . . . may obtain a review of such decision by a civil action commenced within sixty days after the mailing to him of notice of such decision or within such further time as the Commissioner of Social Security may allow.

42 U.S.C. § 405(g). "Under the applicable regulations, the mailing of the final decision is presumed received five days after it is dated unless the claimant makes a reasonable showing to the contrary." *Kesoglides v. Comm'r of Soc. Sec.*, No. 13-CV-4724 (PKC), 2015 WL 1439862, at *3 (E.D.N.Y. Mar. 27, 2015) (citing 20 C.F.R. §§ 404.981, 422.210(c)). Applying this standard, the Court determines that Plaintiff received the Commissioner's final decision on October 23, 2018, and Plaintiff filed the instant action on November 7, 2018—fifteen days later. (*See generally* Compl., Dkt. 1.)

## II. The ALJ Decision

In evaluating disability claims, the ALJ must adhere to a five-step inquiry. The claimant bears the burden of proof in the first four steps of the inquiry; the Commissioner bears the burden in the final step. *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012). First, the ALJ determines whether the claimant is currently engaged in "substantial gainful activity." 20 C.F.R. § 404.1520(a)(4)(i). If the answer is yes, the claimant is not disabled. If the answer is no, the ALJ proceeds to the second step to determine whether the claimant suffers from a severe impairment. 20 C.F.R. § 404.1520(a)(4)(ii). An impairment is severe when it "significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). If the impairment is not severe, then the claimant is not disabled. In this case, the ALJ found that Plaintiff had not engaged in substantial gainful activity since September 15, 2014, and that Plaintiff suffered from the following severe impairments: (1) degenerative disc disease of the cervical and lumbar spines, (2) osteoarthritis of the right shoulder, (3) fibromyalgia, and (4) major depressive disorder with anxiety. (Tr. at 14.) Having determined that Plaintiff satisfied her burden at the first two steps, the ALJ progressed to the third step and determined that none of Plaintiff's impairments met or medically equaled the severity of one of the impairments listed in the Act's regulations, 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526). (*Id.* at 14–16.) Moving to the fourth step, the ALJ found that Plaintiff maintained residual functional capacity ("RFC")[4] to perform

> light work as defined in 20 CFR 404.1567(b) except: the claimant can occasionally push/pull bilaterally; reach overhead occasionally with the upper right extremity; and reach in all other directions frequently with the upper right extremity. The claimant can frequently handle, finger, and feel with the upper right extremity/hand.

---

[4] To determine the claimant's RFC, the ALJ must consider the claimant's "impairment(s), and any related symptoms . . . [which] may cause physical and mental limitations that affect what [the claimant] can do in the work setting." 20 C.F.R. § 404.1545(a)(1).

3

> She is right hand dominant. She can occasionally climb ramps and stairs, but never climb ladders, ropes, or scaffolds. The claimant can frequently balance and occasionally stoop, kneel, crouch, and crawl. She should have no exposure to unprotected heights and only occasional exposure to moving mechanical parts and operating a motor vehicle. She cannot have exposure to vibration. She must avoid frequent exposure to extreme cold, humidity, and wetness. She is limited to more than simple but less than complex tasks, but not at a production rate pace (e.g., assembly line work). She can frequently interact with supervisors and co-workers; occasionally interact with the public. She can tolerate occasional changes in the work setting. She needs to alternate between sitting and standing every 20-30 minutes with a 5-10 minute change of position, while remaining on task. In addition to normal breaks, she will be off-task 5% of the time in an 8-hour workday.

(*Id.* at 16.) Relying on the RFC findings, the ALJ determined that Plaintiff was unable to perform any of her past relevant work as an elementary school teacher. (*Id.* at 21.) The ALJ then proceeded to step five to determine whether Plaintiff—given her RFC, age, education, and work experience—had the capacity to perform other substantial gainful work in the national economy. 20 C.F.R. § 404.1520(a)(4)(v). In this case, the ALJ determined that Plaintiff was capable of working in the following unskilled light-level occupations: stock checker, produce weigher, and collator operator, as well as the sedentary-level occupations: polisher, waxer, and document preparer. (Tr. at 22.) The ALJ concluded that Plaintiff was not disabled. (*Id.*)

## STANDARD OF REVIEW

Unsuccessful claimants for disability benefits under the Act may bring an action in federal district court seeking judicial review of the Commissioner's denial of their benefits. 42 U.S.C. § 405(g). In reviewing a final decision of the Commissioner, the Court's role is "limited to determining whether the [SSA's] conclusions were supported by substantial evidence in the record and were based on a correct legal standard." *Talavera*, 697 F.3d at 151 (internal quotation marks omitted). "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (internal quotation marks and alterations omitted). In determining whether

4

the Commissioner's findings were based upon substantial evidence, "the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Id.* Ultimately, the Court "defer[s] to the Commissioner's resolution of conflicting evidence." *Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 122 (2d Cir. 2012). If there is substantial evidence in the record to support the Commissioner's findings as to any fact, those findings are conclusive and must be upheld. 42 U.S.C. § 405(g); *see also Cichocki v. Astrue*, 729 F.3d 172, 175–76 (2d Cir. 2013).

**DISCUSSION**

Plaintiff argues that the ALJ's RFC determination is not supported by substantial evidence and does not properly apply the relevant legal standards. (Memorandum of Law in Support of Plaintiff's Motion for Judgment on the Pleadings ("Pl.'s Mot."), Dkt. 10-1, at 9.) Plaintiff maintains that the ALJ erred in two ways. First, Plaintiff asserts that the ALJ disregarded the opinion of one vocational expert ("VE") in favor of another whose opinion would be "supportive of [the ALJ's] pre-determined unfavorable decision." (*Id.* at 11.) Second, Plaintiff argues that the ALJ failed to give controlling weight to Plaintiff's treating physicians, in violation of the treating physician rule, and instead gave undue weight to the opinions of medical sources who did not examine Plaintiff, evidence of Plaintiff's conservative treatment, and Plaintiff's self-reported abilities to perform some household activities. (*Id.* at 12–15.)

The Court addresses only Plaintiff's second set of arguments,[5] finding them sufficient, in themselves, to warrant remand. The Court finds that, here, the ALJ's determination of Plaintiff's

---

[5] As discussed *infra*, the Court is not persuaded by Plaintiff's argument regarding the ALJ's use of vocational experts and thus does not rely on this argument in remanding this matter. In addition, because Plaintiff does not challenge the mental health component of the ALJ's RFC determination, the Court need not, and does not, address that aspect of the RFC determination. (*See id.* at 10–16.)

5

RFC was deficient because the ALJ: (1) failed to give proper deference to the opinions of Plaintiff's treating physicians regarding her physical limitations, instead giving undue weight to the opinions of a consultative examiner and a non-examining medical expert; (2) inaccurately characterized Plaintiff's medical treatment as "conservative"; (3) applied an incorrect legal standard in discounting Plaintiff's subjective complaints of chronic pain; and (4) overstated the extent to which Plaintiff's self-reported limitations in her daily activities supported the RFC determination.

### I. The Treating Physician Rule

"With respect to the nature and severity of a claimant's impairments, the SSA recognizes a treating physician rule[6] of deference to the views of the physician who has engaged in the primary treatment of the claimant." *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (internal quotation marks, brackets, and citations omitted). Under the treating physician rule, a treating source's opinion is given "controlling weight" so long as it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and not "inconsistent with the other substantial evidence" in the record. 20 C.F.R. § 416.927(c)(2). If the opinion of the treating physician is not given controlling weight, the ALJ must apply a number of factors in order to determine the opinion's proper weight. *See Shaw v. Chater*, 221 F.3d 126, 134 (2d Cir. 2000). These factors include: (i) the frequency of examination as well as the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the treating source's opinion; (iii) the extent to which

---

[6] Although "[t]he current version of the [Act]'s regulations eliminates the treating physician rule," the rule nevertheless applies to Plaintiff's claim, as the current regulations only "apply to cases filed on or after March 27, 2017." *Burkard v. Comm'r of Soc. Sec.*, No. 17-CV-290 (EAW), 2018 WL 3630120, at *3 n.2 (W.D.N.Y. July 31, 2018); *see also* 20 C.F.R. § 404.1520(c). Because Plaintiff's claim was filed on October 22, 2014, the treating physician rule applies.

the opinion is consistent with the record as a whole; (iv) whether the treating source is a specialist; and (v) other relevant factors. 20 C.F.R. §§ 404.1527(c)(1)–(6), 416.927(c)(1)–(6).

### A. The ALJ Did Not Properly Weigh the Treating Physicians' Opinions

Here, the ALJ gave "little weight" to the opinions of Plaintiff's treating physicians, Idan Sharon, M.D., and Uel Alexis, M.D. (Tr. at 20.) The ALJ came to this conclusion because he found each opinion to be "inconsistent with" other evidence in the case record, namely "the March 2017 treatment notes, the December 2014 internal medicine consultative examination findings, the April and May 2016 treatment records, the February 2017 treatment records, and the claimant's self-reported activities of daily living." (*Id.*) For the reasons set forth below, the Court finds that the ALJ erred by according "little weight" to the opinions of Plaintiff's treating physicians.

At the time of her May 17, 2017 hearing, Plaintiff had been treated for severe back pain by Dr. Sharon, a neurologist, since October 13, 2011. (Tr. at 102, 397, 407–08.) Plaintiff reported seeing Dr. Sharon "once a month[, s]ometimes twice a month." (*Id.* at 102.) The administrative record contains various treatment records of Dr. Sharon covering the period from March through October 2014. (*See id.* at 355–70, 389–91.) In May 2014, Dr. Sharon administered nerve conduction velocity (NCV) and electromyography (EMG) tests to Plaintiff after noting that Plaintiff's symptoms had "worsened" and "changed significantly in the past 6 weeks." (*Id.* at 356, 361.) Dr. Sharon found signs of electrical instability and evidence of "severe chronic L4-L5 [p]olyradiculopathy on the right and left" (*id.* at 358), as well as "evidence of moderate chronic C5 radiculopathy on the right and left" (*id.* at 363). On October 16, 2014, Dr. Sharon completed a report for the Teachers' Retirement System of the City of New York, relaying a "very poor prognosis" for Plaintiff's chronic pain and noting that "she will always have severe pain due to her neurological condition." (*Id.* at 407.)

7

In a treatment letter dated January 15, 2015, Dr. Sharon noted that Plaintiff suffered from depression, anxiety, severe neck pain, lower joint pain, back muscle spasms, occasional dizziness, sinus headaches, and muscular neck pain. (*Id.* at 407.) Dr. Sharon wrote that Plaintiff's pain was "so severe it renders her incapacitated at times," and that they had "not found a pain medication that has relieved her of her agony." (*Id.*) As a result, Dr. Sharon opined that Plaintiff was "not mentally or physically competent to return to work." (*Id.*) In his May 8, 2017 Medical Assessment form, Dr. Sharon indicated that Plaintiff was limited in both her upper and lower extremities, could not lift or carry more than 10 pounds, and had "multiple impairment-related physical limitations." (*Id.* at 473–75.) Dr. Sharon also indicated on the form that he had last seen Plaintiff on April 20, 2017, suggesting that his conclusions were based on treatments and findings much more recent than those contained in the record from May through October 2014. (*See id.* at 475.)

In addition to Dr. Sharon, Plaintiff was treated by orthopedic pain specialist Dr. Alexis monthly, if not twice a month, for at least two or three years prior to the May 17, 2017 ALJ hearing. (*Id.* at 102.) The administrative record contains Dr. Alexis's treatment records at The Spine & Pain Institute of New York ("SPI") from July 2016 through April 2017. (*See id.* at 428–68.) These records demonstrate a series of attempted, but unsuccessful, pain relief interventions between April 2016 and May 2017. On April 20, 2016, Plaintiff saw Marijulia Chava, P.A. ("PA Chava") for a cervical epidural steroid injection ("CESI"). Treatment records for May 24, 2016, however, show that Plaintiff's pain was "unchanged," "constant," and "worsening." (*Id.* at 433.) Plaintiff received a second CESI on June 7, 2016 (*id.* at 438), and, on July 5, 2016, Plaintiff "admit[ted] to having greater than 50% pain relief and functional benefit[,] . . . but pain returned" (*id.* at 441). On July 19, 2016, Dr. Alexis administered a bilateral L2-L5 Lumbar Medial Branch Block ("LMBB"), and Plaintiff reported three weeks later that, while "[t]he pain was diminished after the intervention,"

8

it returned after two weeks. (*Id.* at 447.) On August 16, 2016, Plaintiff again "describe[d] symptoms as worsening" and was advised to "continue [nonsteroidal anti-inflammatory drugs] and muscle relaxant medications." (*Id.* at 447–49.) Plaintiff received a second LMBB on August 17, 2016. (*Id.* at 450.) On November 8, 2016, Plaintiff received a sacroiliac joint injection for her lower back pain. (*See id.* at 452–56.) On January 27, 2017, Dr. Alexis noted a "referral to neurosurgery due to progressive cervical radiculopathy." (*Id.* at 458.) Plaintiff received another CESI on March 28, 2017 (*id.* at 460–61), after which "pain relief duration was one week" (*id.* at 462) before her pain returned. In his Medical Assessment form dated May 5, 2017, Dr. Alexis indicated that Plaintiff could not lift or carry more than 10 pounds, that Plaintiff must "periodically alternate sitting and standing to relieve pain," that Plaintiff was limited in her upper and lower extremities, and that Plaintiff had postural limitations. (*See id.* at 469–72.)

As discussed, if an ALJ does not afford controlling weight to a claimant's treating physicians' opinions, the ALJ must determine the opinions' proper weight by considering factors that include: (i) the frequency of examination as well as the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the treating source's opinion; (iii) the opinion's consistency with the entire record; (iv) whether the treating source is a specialist; and (v) other relevant factors. *See* 20 C.F.R. §§ 404.1527(c)(1)–(6), 416.927(c)(1)–(6); *Shaw*, 221 F.3d at 134. Here, at the time of her May 17, 2017 ALJ hearing, Plaintiff had been seeing Dr. Sharon at least monthly for almost six years and Dr. Alexis monthly for at least two or three years. The ALJ did not consider the longitudinal nature of this treatment, nor did the ALJ explicitly consider that both physicians are specialists—Dr. Sharon in neurology, and Dr. Alexis in orthopedic pain management. Though the ALJ evaluated their opinions' consistency with the

record as a whole, he seemingly disregarded the fact that the record is replete with evidence of Plaintiff's chronic pain.

"'[S]ubjective pain may serve as the basis for establishing disability, even if such pain is unaccompanied by positive clinical findings or other objective medical evidence,' so long as the pain results from a 'physical or mental impairment' as defined by section 223(d)(3) of the Act[.]"[7] *Lim v. Colvin*, 243 F. Supp. 3d 307, 316 (E.D.N.Y. 2017) (quoting *Aubeuf v. Schweiker*, 649 F.2d 107, 111–12 (2d Cir. 1981)); *see also Henriquez v. Chater*, No. 94-CV-7699 (SS), 1996 WL 103828, at *4 (S.D.N.Y. Mar. 11, 1996) ("A claimant's testimony about pain may not be discounted solely because objective clinical findings cannot establish a cause for pain." (citing *Marcus v. Califano*, 615 F.2d 23 (2d Cir. 1979))). Nevertheless, the ALJ determined that Plaintiff's treating physicians' years-long efforts to mitigate her chronic pain, using established laboratory techniques, and their resultant opinions as to her condition, warranted only "little weight," because of the absence of objective clinical findings to support Plaintiff's subjective complaints of pain. This was error. Drs. Sharon's and Alexis's reliance on Plaintiff's reports of chronic pain "hardly undermines [their] opinion as to [Plaintiff's] functional limitations, as a patient's report of complaints, or history, is an essential diagnostic tool." *Green-Younger v. Barnhart*, 335 F.3d 99, 107 (2d Cir. 2003) (internal quotation marks, alterations, and citation omitted); *see also Mahon v. Colvin*, No. 15-CV-398 (FPG), 2016 WL 3681466, at *4 (W.D.N.Y. July 6, 2016) (noting that "reliance on [a plaintiff's] subjective complaints" was not a valid reason

---

[7] Section 223(d)(3) of the Act defines a "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3). Here, the ALJ acknowledged that Plaintiff's degenerative disc disease of the cervical and lumbar spines, osteoarthritis of the right shoulder, fibromyalgia, and major depressive disorder with anxiety were "severe impairments" under 20 C.F.R. § 404.1520(c). (*See* Tr. at 14.)

for rejecting the opinion of a consultative physician[8]). Thus, the ALJ was wrong to place less weight on the treating physicians' opinions to the extent that these opinions were based on Plaintiff's subjective complaints of pain, of which the record contains abundant examples.

The Court concludes that the ALJ did not accord proper weight to Plaintiff's treating physicians' opinions, in violation of the treating physician rule. Given Drs. Sharon's and Alexis's history with Plaintiff, their medical specialties, and the extent to which their medical opinions were informed by, and consistent with, Plaintiff's testimony describing her pain, their opinions should have been given greater weight.

B.  **Other Treatment Records and Findings Received Improper Weight**

The ALJ explained that he afforded the opinions of Drs. Sharon and Alexis "little weight" because they were "inconsistent with the March 2017 treatment notes, the December 2014 internal medicine consultative examination findings, the April and May 2016 treatment records, the February 2017 treatment records, and the claimant's self-reported activities of daily living." (Tr. at 20.) The Court finds that this purported inconsistency should not have diminished or undermined the ALJ's reliance on the opinions of Plaintiff's treating physicians, as courts have specifically cautioned against placing undue reliance on these types of evidentiary records. The Court addresses each type of evidence in turn.

1.  **December 2014 Consultative Examination**

"ALJs should not rely heavily on the findings of consultative physicians after a single examination." *Selian*, 708 F.3d at 419. "A consulting physician's opinions or report are typically

---

[8] The deference accorded to a consultative physician is generally lower than that accorded to a treating physician. *See* Part B.1 *infra*. Thus, if reliance on subjective complaints was not a valid reason for rejecting a consultative physician's opinion, it certainly would not be a valid reason to reject a treating physician's opinion.

11

given limited weight because 'consultative exams are often brief, are generally performed without benefit or review of claimant's medical history and, at best, only give a glimpse of the claimant on a single day.'" *Bullock v. Colvin*, No. 17-CV-5657 (LGS), 2019 WL 967341, at *3 (S.D.N.Y. Feb. 28, 2019) (quoting *Cruz v. Sullivan*, 912 F.2d 8, 13 (2d Cir. 1990)). Here, the ALJ should not have given weight to the December 2014 consultative examination at the expense of the treating physicians' opinions.

The December 22, 2014 internal medicine consultative examination was conducted by Chitoor Govindaraj, M.D. (Tr. at 381.) Dr. Govindaraj observed that Plaintiff could perform "right leg raising" and that she demonstrated normal range of motion of the back and joints, normal hand dexterity, and normal fine manipulation. (*Id.* at 383.) Dr. Govindaraj concluded his examination record with an overall medical prognosis of "fair-to-good" and observed that "patient did not reveal any restriction sitting, standing, walking, or any weight restriction." (*Id.*) Dr. Govindaraj's assessment, however, is inapposite to nearly every finding in the record, including the ALJ's ultimate RFC determination, which stated with regard to Dr. Govindaraj's assessment that: "Little weight is given to this opinion, as it is inconsistent with the overall record showing severe physical and mental impairments." (*Id.* at 20.) Nevertheless, the ALJ proceeded to assign little weight to Plaintiff's treating physicians' opinions in part because of their purported inconsistency with Dr. Govindaraj's findings. (*Id.*) Thus, it was plainly erroneous for the ALJ to accord "little weight" to the opinions of Drs. Sharon and Alexis based on a comparison to Dr. Govindaraj's findings, to which even the ALJ ultimately gave "little weight."

2. **February and March 2017 Records Favoring Conservative Treatment**

The ALJ also afforded little weight to the treating physicians' opinions in part because they were inconsistent with the February and March 2017 treatment records. (*Id.* at 20.) These records

12

were prepared by neurologist Samuel Kim, M.D., at Weill Cornell Medicine. (*Id.* at 416–24.) The February 2017 records showed that Plaintiff, despite a "somewhat limited motor exam due to pain," exhibited "normal cranial nerves, full muscle strength, normal coordination, and normal gait." (*Id.* at 18.) According to the ALJ, Dr. Kim's March 2017 notes indicated that Dr. Kim "favored conservative treatment over surgical intervention" and thus supported the ALJ's RFC determination. (*Id.*)

A physician's recommendation of conservative treatment, in itself, does not undermine a finding of severe limitations. An ALJ may not determine "that the severity of a physical impairment directly correlates with the intrusiveness of the medical treatment ordered[.]" *Shaw*, 221 F.3d at 134 (finding that a treating physician's recommendation of "only conservative physical therapy, hot packs, EMG testing—not surgery or prescription drugs" was not substantial evidence that claimant was not physically disabled). Here, the ALJ also ignored the fact that Dr. Kim's recommendation specifically addressed the possibility of surgical intervention. While Dr. Kim favored "conservative measures . . . in light of [Plaintiff's] stable neurologic status," he noted that he would "entertain [anterior cervical discectomy and fusion ("ACDF")] surgery, though the chance of success of this surgery is not guaranteed." (Tr. at 423.) Consistent with this record of her treatment, Plaintiff testified at the ALJ hearing that her doctors "advised against surgery," either because they determined that it would not help her or "because there's no guarantee that it would work." (*Id.* at 102.) Plaintiff added that she did not want to risk unsuccessful surgery because she didn't "want to be laid up if there's no guarantee and not be able to be there for [her] kids." (*Id.* at 103.)

Furthermore, the ALJ erred in characterizing Plaintiff's treatment as "conservative." According to the ALJ, "the record shows that [Plaintiff] has been treated for years with

conservative methods, such as physical therapy, acupuncture, pain medication, and epidural injections." (*Id.* at 17–18.) This assessment of her treatment is incorrect as a matter of law, for a claimant's treatment is not conservative merely because it consists of non-surgical treatments, such as prescription drugs[9] (*id.* at 421–22), physical therapy, and epidural steroid injections (*id.* at 423). *See Jazina v. Berryhill*, No. 16-CV-1470 (JAM), 2017 WL 6453400, at *6 (D. Conn. Dec. 13, 2017) ("Plaintiff's treatment regimen—which included powerful prescription opioids . . . [and] other prescription drugs, and in the past included physical therapy and injections—does not appear to qualify as conservative[.]"). In addition, this circuit has tended to limit its definition of conservative treatment for claimants with similar symptoms to far more benign treatment regimens. *See, e.g.*, *Penfield v. Colvin*, 563 F. App'x 839, 840 (2d Cir. 2014) (summary order) (walking, home exercise programs, and stretching); *Burgess*, 537 F.3d at 129 ("only over-the-counter medicine"); *Shaw*, 221 F.3d at 134 (physical therapy, hot packs, and EMG testing).

In light of this precedent, and considering the record evidence, Plaintiff's treatment was not accurately characterized as conservative. For example, Dr. Govindaraj noted in his 2014 consultative examination that, at that time, Plaintiff was taking the opiate pain management medications Oxymorphone, Hydrocodone, and Hydromorphone at the direction of her pain management doctor, Kevin H. Weiner, M.D. (Tr. at 381–82.) Dr. Weiner's November 2014 notes, which the ALJ did not explicitly reference in his RFC determination, are further illustrative: Plaintiff "was participating in physical therapy and chiropractic, which caused her more pain," and she was "on numerous medications with minimal relief." (*Id.* at 402.) Dr. Weiner's treatment records also confirm Plaintiff's ongoing dilemma with regard to surgery: on December 11, 2014,

---

[9] Plaintiff in March 2017 was taking Dilaudid (an opioid pain medication) as well as Hydrocodone-Ibuprofen and Tizanidine-Liniment for pain relief. (*Id.* at 421–22.)

14

Plaintiff reported "persistent pain and numbness" and intended to contact the Laser Spine Institute "for possible surgical intervention." (*Id.* at 404.) The record does not suggest that surgery was deemed unnecessary for Plaintiff because her pain was not severe enough to warrant it; rather, the treatment notes indicate that Plaintiff was aware of and carefully weighed the possibility of surgery, ultimately deciding not to pursue surgery at least in part because it could not guarantee relief.

Taken together, Plaintiff's injections, physical therapy, and consistent use of prescription opioid pain-management medications rise above the level of "conservative" treatment. Even assuming, *arguendo*, that Dr. Kim's recommendation for Plaintiff to continue physical therapy and injections while also entertaining surgery did constitute a recommendation only for conservative treatment, the ALJ gave these notes undue weight in arriving at his final decision. "To the extent the conservative nature of plaintiff's treatment was a key factor in the ALJ's conclusion, the Court finds that would be an insufficient basis for finding plaintiff was not disabled in light of the entire record." *Ridge v. Berryhill*, 294 F. Supp. 3d 33, 60 n.12 (E.D.N.Y. 2018) (citing *Shaw*, 221 F.3d at 134). Here, Plaintiff's ostensibly conservative treatment was evidently a key factor in the ALJ's conclusion, as the ALJ compares Dr. Govindaraj's December 2014 consultative examination, the opinion of the non-examining medical expert, Dorothy Leong, M.D. (discussed *infra*), and the opinions of Plaintiff's treating physicians, Drs. Sharon and Alexis, for consistency with Dr. Kim's March 2017 notes favoring conservative treatment. (Tr. at 20.) But the entire record, as discussed *supra*, otherwise contains evidence from Plaintiff's treating physicians, her pain management physician, and Plaintiff herself that contradicts the purportedly conservative nature of her treatment. In any event, because the Court finds that Plaintiff's treatment was not conservative,

15

the Court need not determine whether Plaintiff's ostensibly conservative treatment was a key factor in the ALJ's conclusion.

### 3. Non-Examining Medical Expert Opinion

"The medical opinion of a non-examining medical expert does not constitute substantial evidence and may not be accorded significant weight." *Roman v. Astrue*, No. 10-CV-3085 (SLT), 2012 WL 4566128, at *16 (E.D.NY. Sept. 28, 2012) (citing *Pratts v. Chater*, 94 F.3d 34, 38 (2d Cir. 1996)); *see also Minsky v. Apfel*, 65 F. Supp. 2d 124, 139 (2d Cir. 1999) ("[Medical] advisers' assessment of what other doctors find is hardly a basis for competent evaluation without a personal examination of the claimant." (quoting *Vargas v. Sullivan*, 898 F.2d 293, 295–96 (2d Cir. 1990))). Furthermore, per the applicable regulations, "[w]hen the treating source has seen [the plaintiff] a number of times and long enough to have obtained a longitudinal picture of [the plaintiff's] impairment, we will give the source's opinion more weight than we would give it if it were from a non-treating source." 20 C.F.R. § 404.1527(c)(2)(i). Here, the ALJ should not have given "significant weight" to the opinion of the non-examining medical expert, Dr. Leong. Furthermore, the inconsistency between the treating physicians' and Dr. Leong's opinions did not warrant giving less weight to the former.

The ALJ afforded "significant weight" to the opinion of the non-examining medical expert Dr. Leong, who, according to the ALJ, "reviewed the entire record and [] cited specific evidence that provide[d] the basis for her opinion." (Tr. at 20.) However, Dr. Leong only "responded to a medical interrogatory" and did not examine Plaintiff in person. (*Id.* at 11, 490.) The ALJ's reliance on Dr. Leong's opinion was therefore inappropriate, especially over those of Plaintiff's treating physicians. *See Roman*, 2012 WL 4566128, at *16 (finding error where the ALJ assigned significant weight to the medical opinion of a non-examining medical expert). The ALJ explained

that he gave significant weight to Dr. Leong's opinion because it was consistent with the December 2014 internal medicine consultative examination done by Dr. Govindaraj, the treatment Plaintiff received in April and May 2016, the February 2017 treatment records, and the March 2017 treatment records, as well as Plaintiff's self-reported activities of daily living. (*Id.* at 20.) However, the fact that Dr. Leong was a non-examining medical expert who only reviewed other physicians' findings in the record is sufficient grounds not to afford her opinion significant weight. In addition, the Court notes that her opinion should not be afforded greater weight for its consistency with records that the Court has already deemed undeserving of such weight. (*See* discussion *supra*.)

### C. Plaintiff's Self-Reported Activities Were Incorrectly Weighed

While an ALJ is not "required to credit [a plaintiff's] testimony about the severity of her pain and the functional limitations it cause[s]," *Rivers v. Astrue*, 280 F. App'x 20, 22 (2d Cir. 2008) (summary order), the ALJ does not have unbounded discretion in choosing to reject it. "[T]he subjective element of pain is an important factor to be considered in determining disability." *Perez v. Barnhart*, 234 F. Supp. 2d 336, 340 (S.D.N.Y. 2002) (quoting *Mimms v. Heckler*, 750 F.2d 180, 185 (2d Cir. 1984)); *see also* 20 C.F.R. § 404.1529(c)(4) ("[The claimant's] symptoms, including pain, will be determined to diminish [the claimant's] capacity for basic work activities to the extent that [the claimant's] alleged functional limitations and restrictions due to symptoms, such as pain, can reasonably be accepted as consistent with the objective medical evidence and other evidence."). Thus, the ALJ determines not whether the objective medical evidence of a plaintiff's pain is consistent with an inability to perform all substantial activity, but whether a plaintiff's statements as to her pain are consistent with the objective medical evidence. *See*

*Correale-Englehart v. Astrue*, 687 F. Supp. 2d 396, 435 (S.D.N.Y. 2010). The ALJ in the instant action erred by not conducting the latter analysis.

According to the ALJ, Plaintiff "testified and stated in her function report that she is capable of some activities of daily living, such as being able to drive to her daughter [sic] to take short walks, prepare simple meals, go outside alone, shop in stores, and go to church." (Tr. at 14.) The ALJ also pointed out that Plaintiff drove herself to the May 17, 2017 hearing and described being able to talk on the phone in her function report. (*Id.* at 15.) In doing so, the ALJ mischaracterized the majority of Plaintiff's function report. Plaintiff made clear that her functionality was limited, for example, by specifying that she was only able to dress "very slowly" and sometimes needed "family assistance." (*Id.* at 271.) In his decision, the ALJ highlighted that Plaintiff could "prepare simple meals" (*id.* at 14), but Plaintiff also noted at the hearing that it was sometimes "too painful" to do so. (*Id.* at 272.) Plaintiff further indicated that she had ceased to do household chores because it was "too painful." (*Id.* at 273.) Plaintiff did indicate that she was able to drive and that she regularly went to church (*id.* at 275) but stated that she could drive "only local[ly]" (*id.* at 274) and "for about 30 minutes at a time before the sciatica kicks in and I'm in a lot of pain" (*id.* at 103). Furthermore, while Plaintiff indicated that she had the ability to shop in stores, she also indicated that she shopped over the phone and on her computer, noting that she shopped online and received deliveries at home. (*Id.* at 108.) Plaintiff described additional limitations that the ALJ did not mention: "In my neck, radiculopathy down my arm, my lower back. I'm in pain all day every day." (*Id.* at 101.) "I can't reach up. I can't grab things. I have my kids get everything for me in the house. . . . I can't hold. I drop things." (*Id.* at 104.) However, the ALJ chose to disregard these statements in favor of a handful of anecdotes that would seem to indicate Plaintiff's normal functionality. This was error. *See Lim*, 243 F. Supp. 3d at 317 n.7

(remanding case, given the claimant's subjective complaints of pain and accordingly limited functionality, with the direction that "[t]hese stated limitations should be considered on remand").

Besides mischaracterizing Plaintiff's testimony about her pain and limited functionality, the ALJ also failed to determine whether this testimony was consistent with the record evidence, instead assessing Plaintiff's limitations based on whether she could perform any activity of daily living. This, too, was improper. *See Correale-Englehart*, 687 F. Supp. 2d at 435 ("The issue is whether . . . plaintiff's statements about the intensity, persistence, or functionally limiting effects of her pain are consistent with the objective medical and other evidence.").

* * *

In sum, the Court finds that the ALJ: (1) failed to accord proper weight to the opinions of Plaintiff's treating physicians, Drs. Sharon and Alexis, as inconsistent with the overall treatment record and the opinions of non-treating physicians; (2) accorded undue weight to the consultative examination of Dr. Govindaraj and the opinion of the non-examining medical expert, Dr. Leong; (3) improperly characterized Plaintiff's treatment regimen as "conservative"; and (4) did not apply the correct legal standard in evaluating Plaintiff's reported pain and did not properly credit Plaintiff's subjective complaints of her pain.[10]

---

[10] As discussed, the Court's decision is not based on the alleged error relating to the ALJ's reliance on the opinion of one VE, Dr. Michael Smith, over that of another, Dr. Gerald Belchick, whose opinion would have supported Plaintiff's claim of disability. (Pl.'s Mot., at 11.) First, based on the record and procedural history in this case—which, *inter alia*, demonstrated ample ground for the ALJ to replace Dr. Belchick with Dr. Smith and further demonstrated that Plaintiff consented, or at least acquiesced, to this change—the ALJ acted within his discretion to rely on Dr. Smith as the VE. However, as discussed *supra*, because the RFC determination on which Dr. Smith relied was not supported by substantial evidence, Dr. Smith's opinion about the existence of Plaintiff's potential occupations was invalid. Second, Plaintiff's assertion that it would have been proper for the ALJ to rely on VE Belchick's opinion but not on Smith's, when both VEs would be relying on an RFC that Plaintiff claims is deficient, reveals the self-defeating and disingenuous nature of this argument. Furthermore, Plaintiff concedes that the hypothetical sent

# CONCLUSION

For the reasons set forth above, the Court grants Plaintiff's motion for judgment on the pleadings and denies the Commissioner's cross-motion. The Commissioner's decision is remanded for further consideration consistent with this Order. The Clerk of Court is respectfully requested to enter judgment and close this case.

SO ORDERED.

*/s/ Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated: January 9, 2020
       Brooklyn, New York

---

to VE Smith more accurately reflected Plaintiff's characteristics because the hypothetical considered "the additional functional limitations adopted in the ALJ's decision." (*Id.* at 12.)